UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

MAURICE KENNETH MONTGOMERY,

     Petitioner,

v.                                 Case No.  3:15cv43/MCR/CJK

JULIE L. JONES,

     Respondent.

_____/

## REPORT AND RECOMMENDATION

Before the court is a petition for writ of habeas corpus filed under 28 U.S.C. § 2254, with supporting memorandum.  (Docs. 1, 2).  Respondent filed an answer, submitting relevant portions of the state court record.  (Doc. 19).  Petitioner has not replied although invited to do so.  (Doc. 20).  The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B).  After careful consideration of all issues raised by petitioner, the undersigned concludes that no evidentiary hearing is required for the disposition of this matter.  Rule 8(a) of the Rules Governing Section 2254 Cases in the United States District Courts.  The undersigned further concludes that the

pleadings and attachments before the court show that petitioner is not entitled to habeas relief, and that the petition should be denied.

## BACKGROUND AND PROCEDURAL HISTORY

Petitioner was charged by amended information filed in Escambia County Circuit Court Case No. 11-CF-4156, with possession of a firearm by a convicted felon (10-20-Life) (Count 1), aggravated assault by threat with a firearm (Counts 2 and 3 – victims Hallman and Prosen) and aggravated assault by threat with a deadly weapon – a vehicle (Counts 4 and 5 – victims Hallman and Prosen). (Doc. 19, Ex. A, p. 3).[1] The incidents occurred in the early morning hours of August 28, 2011. (*Id*.). The State filed notice of petitioner's qualification as a Prison Releasee Reoffender (PRR) and required sentencing under Fla. Stat. § 775.082. The State also filed notice of its intent to seek petitioner's enhanced sentencing as a Habitual Felony Offender (HFO), a Habitual Violent Felony Offender (HVFO), and/or a Violent Career Criminal (VCC). (Ex. A, pp. 32-35). On the morning of jury selection, the charge of possession of a firearm by a convicted felon was severed. (Ex. C, pp. 10-11). Petitioner went to trial on the remaining counts and was found

---

[1]Citations to exhibits are to those provided at Doc. 19. If a page of an exhibit has more than one page number, the court's citation refers to the number appearing at the bottom center of the page.

guilty of the lesser included offense of simple assault on Counts 2 and 3.  Petitioner was found guilty as charged on Counts 4 and 5 of aggravated assault by threat using a vehicle.  (Ex. A, pp. 151-153).

Petitioner was adjudicated guilty according to the jury verdict and was sentenced to time served on the two simple assault convictions (Counts 2 and 3).  (Ex. A, pp. 185-193).  Count 1 was nolle prossed.  (Ex. A, pp. 166-167, 192).  Petitioner was adjudicated a HFO and PRR on one of the aggravated assault convictions (Count 4) and sentenced to 10 years in prison with a 5-year mandatory minimum.  Petitioner was sentenced on the other aggravated assault conviction (Count 5) to a concurrent 5-year term of imprisonment.  (*Id*.).  The Florida First District Court of Appeal (First DCA) affirmed the judgment and sentences, per curiam and without a written opinion.  *Montgomery v. State*, 118 So. 3d 810 (Fla. 1st DCA 2013) (Table) (copy at Ex. H).  Petitioner's motion for rehearing was denied on August 21, 2013.  (Ex. J).

On November 12, 2013, petitioner filed a *pro se* motion for postconviction relief under Florida Rule of Criminal Procedure 3.850.  (Ex. L, pp. 1-25).  The state court struck the motion as insufficiently pled, with leave to amend.  (Ex. L, pp. 139-140).  Petitioner filed an amended motion (Ex. L, pp. 141-170), which was denied

without an evidentiary hearing.  (Ex. N, pp. 284-405).  The First DCA affirmed, per curiam and without a written opinion.  *Montgomery v. State*, 151 So. 3d 1237 (Fla. 1st DCA 2014) (Table) (copy at Ex. O).  The mandate issued November 25, 2014. (Ex. O).

Petitioner filed his federal habeas petition on February 9, 2015.  (Doc. 1).  The petition raises nine grounds for relief.  Respondent asserts that all of petitioner's claims fail for one or more of the following reasons: (1) the claim is without merit, (2) the claim is procedurally defaulted, (3) the claim is not cognizable on federal habeas review.  (Doc. 19).

## RELEVANT LEGAL PRINCIPLES

Exhaustion and Procedural Default

Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all available state court remedies for challenging his conviction, 28 U.S.C. § 2254(b)(1), thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights."  *Duncan v. Henry*, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L. Ed. 2d 865 (1995) (*quoting Picard v. Connor*, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).  The petitioner "must give the state courts one full opportunity to resolve any constitutional issues

by invoking one complete round of the State's established appellate review process."

*O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999);

*Picard*, 404 U.S. at 277-78. A claim that was not presented to the state court and

can no longer be litigated under state procedural rules is considered procedurally

defaulted, *i.e.,* procedurally barred from federal review. *O'Sullivan*, 526 U.S. at 839-

40, 848; *Hittson v. GDCP Warden*, 759 F.3d 1210, 1260 n.56 (11th Cir. 2014)

("Where a return to state court would be futile – because the petitioner's claims

would clearly be barred by state procedural rules – a federal court can 'forego the

needless judicial ping-pong' and treat unexhausted claims as procedurally

defaulted." (*quoting Snowden v. Singletary*, 135 F.3d 732, 736 (11th Cir. 1998)));

*Chambers v. Thompson*, 150 F.3d 1324, 1326-27 (11th Cir. 1998) (holding that

federal habeas courts should enforce applicable state procedural bars even as to

claims that were never presented to the state courts).

A claim is also considered procedurally defaulted if it was presented to the

state court but rejected on the independent and adequate state ground of procedural

bar or default. *Maples v. Thomas*, 565 U.S. 266, 280, 132 S. Ct. 912, 181 L. Ed. 2d

807 (2012) ("As a rule, a state prisoner's habeas claims may not be entertained by a

federal court when (1) a state court [has] declined to address [those] claims because

the prisoner had failed to meet a state procedural requirement, and (2) the state judgment rests on independent and adequate state procedural grounds." (alterations in original) (internal quotation marks and citations omitted)); *Caniff v. Moore*, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."). The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question. *Lee v. Kemna*, 534 U.S. 362, 122 S. Ct. 877, 151 L. Ed. 2d 820 (2002). The adequacy requirement has been interpreted to mean that the state rule must be "firmly established and regularly followed," *Siebert v. Allen*, 455 F.3d 1269, 1271 (11th Cir. 2006), that is, not applied in an "arbitrary or unprecedented fashion," *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001), or in a manifestly unfair manner. *Ford v. Georgia*, 498 U.S. 411, 424-25, 111 S. Ct. 850, 112 L. Ed. 2d 935 (1991); *Upshaw v. Singletary*, 70 F.3d 576, 579 (11th Cir. 1995).

A petitioner seeking to overcome a procedural default must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S. Ct. 2546, 115 L.Ed.2d 640 (1991); *Tower v. Phillips*, 7 F.3d 206, 210 (11th Cir. 1993). "For

cause to exist, an external impediment, whether it be governmental interference or

the reasonable unavailability of the factual basis for the claim, must have prevented

petitioner from raising the claim." *McCleskey v. Zant*, 499 U.S. 467, 497, 111 S. Ct.

1454, 113 L. Ed. 2d 517 (*citing Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct.

2639, 91 L. Ed. 2d 397 (1986)).  The miscarriage of justice exception requires the

petitioner to show that "a constitutional violation has probably resulted in the

conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327, 115

S. Ct. 85, 130 L. Ed. 2d 808 (1995).  This standard is very difficult to meet:

> [A] substantial claim that constitutional error has caused the conviction
> of an innocent person is extremely rare.  To be credible, such a claim
> requires [a] petitioner to support his allegations of constitutional error
> with new reliable evidence – whether it be exculpatory scientific
> evidence, trustworthy eyewitness accounts, or critical physical
> evidence – that was not presented at trial.

513 U.S. at 327.  "To establish the requisite probability, the petitioner must show

that it is more likely than not that no reasonable juror would have convicted him."

*Id.*

Section 2254 Standard of Review

Federal courts may issue habeas corpus relief for persons in state custody

pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death

Penalty Act of 1996 (AEDPA).  Pub. L. 104-132, § 104, 110 Stat. 1214, 1218-19.

Section 2254(d) provides, in relevant part:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (2011).

The United States Supreme Court explained the framework for § 2254 review

in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[2]

The appropriate test was described by Justice O'Connor as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas

---

[2]Unless otherwise noted, references to *Williams* are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367-75, 390-99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and – except as to the footnote – Scalia) in part II (529 U.S. at 403-13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412-13 (O'Connor, J., concurring).

Employing the *Williams* framework, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a state court proceeding, the federal court must first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" only when a Supreme Court holding at the time of the state court decision embodies the legal principle at issue. *Thaler v. Haynes*, 559 U.S. 43, 47, 130 S. Ct. 1171, 175 L. Ed. 2d 1003 (2010); *Woods v. Donald*, — U.S. —, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015) ("We have explained that clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions." (internal quotation marks and citation omitted)).

After identifying the governing legal principle(s), the federal court determines whether the state court adjudication is contrary to the clearly established Supreme

Court case law.  The adjudication is not contrary to Supreme Court precedent merely because it fails to cite to that precedent.  Rather, the adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases.  *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases – indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.").  Where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law.  *See Woods*, 135 S. Ct. at 1377 (holding, as to claim that counsel was *per se* ineffective in being absent from the courtroom for ten minutes during testimony concerning other defendants:  "Because none of our cases confront the specific question presented by this case, the state court's decision could not be contrary to any holding from this Court." (internal quotation marks and citation omitted)).  If the state court decision is contrary to clearly established federal law, the federal habeas court must independently consider the merits of the petitioner's claim.  *See Panetti v. Quarterman*, 551 U.S. 930, 954, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007).

If the "contrary to" clause is not satisfied, the federal habeas court next determines whether the state court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The federal court defers to the state court's reasoning unless the state court's application of the legal principle(s) was "objectively unreasonable" in light of the record before the state court. *Williams*, 529 U.S. at 409; *see Holland v. Jackson*, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam).  In applying this standard, the Supreme Court has emphasized:

> When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong.  Federal habeas review thus exists as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal."  *Harrington, supra*, at 102-103, 131 S. Ct. 770 (internal quotation marks omitted).

*Woods*, 135 S. Ct. at 1376 (*quoting Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."    28 U.S.C. § 2254(d)(2).    The "unreasonable

determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011). As with the "unreasonable application" clause, the federal court applies an objective test. *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). Federal courts "may not characterize . . . state-court factual determinations as unreasonable merely because we would have reached a different conclusion in the first instance." *Brumfield v. Cain*, — U.S. —, 135 S. Ct. 2269, 2277, 192 L. Ed. 2d 356 (2015) (quotation marks omitted).

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct. 28 U.S.C. § 2254(e)(1). The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*; *see, e.g., Miller-El*, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"). Neither the Supreme Court nor the

Eleventh Circuit has interpreted how § 2254(d)(2) and § 2254(e)(1) interact in the context of fact-based challenges to state court adjudications. *Cave v. Sec'y for Dep't of Corr.*, 638 F.3d. 739 (11th Cir. 2011). However, the Eleventh Circuit declined to grant habeas relief under § 2254(d)(2) in the context of a state appellate court's summary affirmance, where it found that the validity of the state court decision was not premised on the trial court's unreasonable fact finding, and that the petitioner failed to demonstrate "by clear and convincing evidence that the record reflect[ed] an insufficient factual basis for affirming the state court's decision." *Gill*, 633 F.3d at 1292.

Only if the federal habeas court finds that the petitioner satisfied AEDPA and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See Panetti*, 551 U.S. at 954. Even then, the writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a). "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102.

## DISCUSSION

Ground One  "The trial court erred in denying the defense motion for continuance when the Defendant had been representing himself until shortly before trial was to begin, but then was appointed counsel, who stated that he had not had adequate time to prepare for trial, denying him due process and a fair trial, U.S. Const. Amend. 14, as well as the right to counsel."  (Doc. 1, p. 6).

Petitioner challenges the trial court's denial of his motion for a continuance made the morning of jury selection.  (Doc. 1, pp. 6-8).  Petitioner claims the denial of a continuance violated his right to due process because appointed counsel (Assistant Public Defender Crawford) had only one week to prepare for trial and informed the court that he was not prepared.  The parties agree that petitioner exhausted this claim by presenting it in his direct appeal.  (Doc. 1, p. 9; Doc. 19, p. 19).  Respondent asserts that petitioner is not entitled to habeas relief, because he cannot establish that the state court's decision was contrary to or an unreasonable application of federal constitutional law.  (Doc. 19, pp. 21-27).

 A.  Clearly Established Federal Law

In *Ungar v. Sarafite*, 376 U.S. 575, 84 S. Ct. 841, 11 L. Ed. 2d 921 (1964), the Supreme Court addressed a defendant's constitutional challenge to the denial of his request for a continuance, stating:

The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.

*Ungar*, 376 U.S. at 589 (citations omitted). The Supreme Court reiterated that standard in *Morris v. Slappy*, 461 U.S. 1, 103 S. Ct. 1610, 75 L. Ed. 2d 610 (1983):

Not every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel. Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons. Consequently, broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary "insistence upon expeditiousness in the face of a justifiable request for delay" violates the right to the assistance of counsel.

461 U.S. at 11-12 (*quoting Ungar*, 376 U.S. at 589) (other citation omitted).

B.     Review of State Court's Decision

Petitioner presented this claim as Issue I in his direct appeal. (Ex. E). The First DCA summarily affirmed the judgment. (Ex. H). Where, as here, "the last adjudication on the merits provides no reasoned opinion, federal courts review that

decision using the test announced in *Richter*." *Wilson v. Warden, Ga. Diagnostic Prison*, 834 F.3d 1227, 1235 (11th Cir. 2016), *cert. granted*, No. 16-6855, 2017 WL 737820 (U.S. Feb. 27, 2017).  The *Richter* test provides that "[w]here a state court's decision is unaccompanied by an explanation," a petitioner's burden under section 2254(d) is to "show[ ] there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.  "[A] habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the] Court." *Id.* at 102.

Applying *Richter*, the petitioner here must establish there was no reasonable basis for the First DCA to reject his claim.  In reviewing the reasonableness of the First DCA's decision, this court may, but is not required to, look to the reasoning of the state court below (the state trial court) when it denied petitioner's request for a continuance.  As the Eleventh Circuit explained in *Wilson*:

> When the reasoning of the state trial court was reasonable, there is necessarily at least one reasonable basis on which the state [appellate] court could have denied relief and our inquiry ends.  In this way, federal courts can use previous opinions as evidence that the relevant state court decision under review is reasonable.  But the relevant state court decision for federal habeas review remains the last adjudication on the

merits, and federal courts are not limited to assessing the reasoning of the lower court.

834 F.3d at 1239.

The First DCA reasonably could have concluded that the trial court's denial of a continuance was not so arbitrary as to violate petitioner's constitutional rights. Newly appointed defense counsel (Attorney Crawford) orally moved for a continuance on the morning of jury selection (December 5, 2011), stating that the defense was not prepared because a prosecution witness (Ms. Rogalski) had not been deposed, and the defense needed to conduct second depositions of other prosecution witnesses (Deputy Smith, Mr. Prosen and Mr. Hallman) because petitioner conducted their first depositions when he was representing himself and his questioning was "not fully adequate to impeach [the witnesses] at trial." (Ex. C, pp. 3-5). The trial court denied the motion, detailing her reasons for the express purpose of appellate review:

> THE COURT: Okay. As I said in chambers, Mr. Crawford, the posture of this case is that when we started the case very early Mr. Montgomery filed a speedy trial demand. The morning that we were set to pick a jury Mr. Montgomery seemed to be – is Ms. Ibanez here [petitioner's previous, court-appointed standby counsel]? If she is, I may have her put some things on the record. He seemed to be communicating with her and he said that he was willing to withdraw his speedy trial demand. I did not have to let him do that. He did make a reference because I'm going to put this on the record before about my mother-in-law was very

ill and in fact dying that week, but I told him that I could try the case that week but he seemed to be communicating with Ms. Ibanez and I knew it was a PRR life case and I didn't have to let him withdraw but I did. And then he chose to participate in discovery and ha[d] some depositions set and Ms. Ibanez, if you can float up here for just a second. My understanding there was some complication with getting them taken downtown or somehow but ultimately you were there present while he took the depositions, correct?

MS. IBANEZ:  Your Honor, I was present at the beginning before I was asked by Mr. Montgomery to leave the courtroom. There was some difficulty in the logistics. I believe he wasn't transported until about an hour and a half late. The jail thought [sic] they had been scheduled said they were not scheduled and we had to get in touch with the sheriff's department attorney and get it all set up again that morning but yes.

THE COURT:  And you were there and available and he asked you to leave?

MS. IBANEZ:  Yes.

THE COURT:  Okay. So there was the opportunity to take depos and I understand Mr. Montgomery is not an attorney, but I had in fact continually he and I have done the Farretta [sic] thing many times together and he knew he could have used Ms. Ibanez and had her help him or do it himself and I don't think there is a requirement that you get to redepose people. He chose last week to have you represent him. That is great, but the things that need to be done, some of which need to be redone some of which were his decision to represent himself, I think whatever CAD report can be produced this week and we are going to talk as we gather jurors about the issue about whether Meaghan Rogalski is going to testify and whether that is relevant. But I'm going to deny your request for a continuance. We are going to pick a jury and if you want to try it Thursday so you have more time this week to get ready then we can try it Thursday. Are you ready to go, Mr. Lusko [prosecutor]?

MR. LUSKO:  Yes, Your Honor.

THE COURT:  Okay.  I don't know – Mr. Montgomery traditionally has not wanted to dress out.  I don't know if he wants to dress out today or not.

THE DEFENDANT:  I want to address the Court, Your Honor.  The fact is what you are saying the more you couldn't get is what Mr. Lusko was withholding.  He said it was available.  It is on the record that I asked him to provide me with the CD's so that I could listen to them and be prepared for trial.  Mr. Lusko said give me some CD's so I can run you a copy.  How can I do that, I'm in jail.  He got it on the discovery that said it was available to me.  I never seen it.  I never heard the 911 or none [o]f that.  I asked.  It is on record at the record at the deposition where he got sarcastic with me and told me you send me some CD's and I'll give it to you.  I have it here with me today.  This guy [Attorney Crawford] don't have a chance, Your Honor, to look at nothing.  We are not ready for trial.  And I'm saying Mr. Lusko have been delaying me and sandbagging me on different occasions.  This is what made me act up in court before, Your Honor, because of the way I'm being treated because I was representing myself.  I begged the Court to give him time.  I said I wasn't going to interrupt anymore.  I haven't.  Give him time.  He haven't had time.  He haven't [sic] given the things he should have had.  He told me that I got to give him the CD blanks.  I don't have blanks.

I have been in another courtroom with Judge Geeker before and they have Mr. Joseph Schiller they send me the CD's to the jail.  That wasn't right for him to hold me up for that on a case like this, Your Honor.

THE COURT:  Okay.  But I'm assuming Mr. Crawford now has the 911 tape.

MR. LUSKO:  Yes, Your Honor, it has been provided.  It was listed in discovery, we did have those 911 calls and they were available for review as well.

THE COURT:  Your objections, Mr. Montgomery, are noted for the record.  I think the record is clear and if you are found guilty, that [is] something that you may pursue on appeal, but my position is that you dropped a speedy trial demand, I allowed you to withdraw it last time, I have tried to encourage you to have an attorney and you know all that.  And Mr. Crawford, if anybody can do it, Mr. Crawford can do it.  So we are going to talk in a moment.  We got to make a decision about whether you're getting dressed out.

(Ex. C, pp. 5-9).  Three days later, on the morning of trial (December 8, 2011),

defense counsel renewed his request for a continuance.  (Ex. C, pp. 168-184).  The

court denied a continuance, explaining:

THE COURT:  Thank you.  Let me make some comments on the record.

Mr. Montgomery appeared in front of me on September 23rd.  Mr. Montgomery wanted to represent himself.  I did a Faretta inquiry.  I told him he could represent himself.

Fairly shortly after that, I got a demand for speedy trial.

On October 10th, I appointed Meredith Ibanez from the Public Defender's Office as standby counsel over objection, but I felt that it was important to administration of justice that she be standby counsel.

In my presence, Mr. Montgomery really didn't have much in the way of dealings with her, but I wanted Ms. Ibanez ready to take over the case.

On the same day there was an order to show cause that Mr. Lusko brought regarding Meaghan Rogalski.  And Mr. Montgomery, on the record, I believe – I mean, it would have been on the record because it happened in open court – said, who's that?  I made Mr. Lusko give at least some identifying information about Ms. Rogalski, that she was, in fact, someone who had seen him with a gun earlier that day.  Mr. Montgomery made a comment about that, and so as of October 10th, Ms. Rogalski had been identified in open court.

Then on October 25th, the discovery was filed listing Rogalski and Wright as witnesses and all the other people as witnesses and presumably providing information to Mr. Montgomery.  We never heard from Mr. Montgomery, other than the discs, that he did not receive his discovery.

The next issue was that we at some point came up for trial.  He filed a demand; he was still pro se; Ms. Ibanez is still standby counsel, and it may have been around that October 10th date.  And Mr. Montgomery seemed to be cooperative with Ms. Ibanez.  He is facing life as a prison releasee re-offender, and he expressed a desire to withdraw his demand for speedy trial, which I did not have to let him do, but I wanted him [sic] to give him an opportunity to participate in discovery.

Ms. Ibanez, I think, tried to help coordinate taking some depos.  They had to be taken down here.  Mr. Montgomery continued to insist that he was pro se and she was standby.  There w[ere] some problems that day with the depos.  I wasn't involved in all of that, but apparently the whole thing ended badly.  Essentially Ms. Ibanez, which she's already said this on the record, was told at some point to leave.  Mr. Lusko was left with Mr. Montgomery.  The depos did not go well, but that was Mr. Montgomery's choice.

As of November 23rd, Mr. Crawford, as you've made your point, you were still standby counsel.  You were not counsel of record until November 28th.

So I had already let Mr. Montgomery off the speedy trial demand. We got to the week of the 28th. You said you were going to be onboard. I continued the case to this week to give you a chance to get up to speed on the case.

I alerted as you've already read on December 2nd that there was a very strong likelihood that this case was going to trial, and then I set if for Thursday of this week specifically so there would be more time for the case to develop.

While I honestly don't have a specific memory, Mr. Crawford, one way or the other about what was said up in my chambers about whether you were or were not ready for trial on the 28th[,] I do remember saying that you wanted to try to talk to some people. I know you said that.

And at any rate, I don't remember on Monday [December 5, 2011] hearing the details of her today, but now it's in the record.

So the bottom line is, and for any appellate purposes or any appellate review if this case is tried to a guilty verdict, if the case is not tried this week – first of all, the jury has been sworn, but it could not be tried until January 31st at the earliest.

I'm going to deny th[e] Defense's motion for continuance.

I would like us to wrap up whatever we need to wrap up so we can actually start the trial.

(Ex. C, pp. 190-193).

The trial court's findings of fact and reasoning provide a reasonable basis on

which the First DCA could have denied relief on petitioner's due process and right-

to-counsel claims.  Requiring a defendant to go to trial with a newly retained attorney could, under some specific circumstances be constitutionally suspect.  Petitioner, however, caused the situation and failed to show that his constitutional rights were violated or that it made any relevant difference.  The Public Defender's Office was on standby status for nearly two months before trial.  The only allegation of prejudice petitioner makes is his conclusory assertion – unsupported by specific facts – that defense counsel was hampered in cross-examining witnesses because petitioner failed to adequately question them during his pre-trial depositions conducted *pro se*.  (Doc. 1, p. 8).  Petitioner's insistence on representing himself, exacerbated by his demand that court-appointed standby counsel leave the room during depositions, and his failure to adequately depose witnesses due to his loss of self-control or lack of proper questioning were all issues within his control.  Furthermore, although Attorney Crawford was lead counsel at trial, the record reflects that prior standby counsel Attorney Ibanez was at counsel table and available for consultation throughout the trial.  Attorney Ibanez also represented petitioner at his sentencing hearing.  Petitioner has not shown that, in light of the totality of the circumstances, his request for a continuance was justified or arbitrarily denied.  As fairminded jurists can concur in the First DCA's determination that petitioner was not denied

due process or the right to effective assistance of counsel when his request for a continuance was denied, petitioner is not entitled to federal habeas relief on Ground One.

Ground Two     "The trial court erred in denying the defense motions for mistrial when several witnesses made reference to uncharged crimes and/or prior bad acts, resulting in denial of due process and a fair trial, U.S. Const Amend. 14." (Doc. 1, p. 10).

This claim involves three separate instances where, according to petitioner, the jury was permitted to hear inadmissible evidence of uncharged crimes or prior bad acts. The prior bad act was an incident involving petitioner and witness Meaghan Rogalski that occurred at Rogalski's residence two hours prior to the incident involving Mr. Hallman and Mr. Prosen, and which resulted in the police being called to Rogalski's residence.

The first instance of which petitioner complains occurred during Meaghan Rogalski's testimony. On direct, Ms. Rogalski testified that petitioner came to her house at 2:00 a.m. on August 28, 2011, and had a gun with him. (Ex. D, pp. 227-228). On cross, the following occurred:

> Q. [Defense counsel Mr. Crawford] Ms. Rogalski, you told us that you saw the gun, right?
>
> A. [Ms. Rogalski] Yes.

Q.  But all that you can tell us is that it was dark?  You couldn't tell the exact color of the gun?

A.  Well, when it[']s waving in my face –

THE COURT:  Ma'am, if it's a "yes or no," I want you to answer "yes" or "no."

THE WITNESS:  What was the question again?

Q.  (By Mr. Crawford)  You can't tell us what color the gun was exactly, correct?

A.  No, sir.

    . . . .

Q.  Let me ask you this one.  One more question.  Were any charges placed against Mr. Montgomery for that when you saw him with a gun?

MR. LUSKO [Prosecutor].  Judge, I'll object –

THE WITNESS:  Were any charges what?

THE COURT: Wait, ma'am.   There's an objection.   Stop speaking.

MR. LUSKO:  He's opening the door here, Judge.

MR. CRAWFORD:  I think she already answered.

THE COURT:  I'll sustain the objection.  Don't answer the question.

(Ex. D, pp. 229-230, 232-233).  The prosecutor then sought to question Rogalski about the police responding to her home that night (i.e., early morning hours) of the incident:

> MR. LUSKO:  Judge, I believe the door has been opened for me at least to ask if the police had to come out to her house that night or whether the police responded that night.. . . [A]sking whether something was reported to the police that night, the night of this incident, is what I want to ask her.  Not the specifics, just were the police called and responded to her house.
>
> MR. CRAWFORD:  Your Honor, during my questions, her answer was he was waving it in my face.  I didn't move for a mistrial at that point in time, but waving it in her face would assume that there's some criminal stuff going on.  That's why I didn't follow-up.  Now, if this is the route, I am going to have to move for a mistrial based on the waving in the face comment that she made.
>
> MR. LUSKO:  Judge, he asked her about what type of gun it was and asking her to describe the gun.  I think there's an argument there as to why she didn't see the exact details of this gun if we want to go down that path.
>
> THE COURT:  I have your argument.  I'm going to overrule the objection – or let's put it this way, I don't think the door has been opened for you to go further into that.  So I'll deny you[r] request to go into – . . .
>
> MR. LUSKO:  Judge, so I can bring up whether the police were called out there or anything like that?
>
> THE COURT:  No.  I'll limit you on that.

(Ex. D, pp. 233-235).  The trial court did not rule on the motion for mistrial at that time.

The second instance involved Deputy Amanda Smith's testimony.  Deputy Smith was asked about showing the victims (Hallman and Prosen) a photo lineup and stated that the photo lineup "had already been generated from a previous incident that was –" (Ex. D, p. 241).  Defense counsel objected, the objection was sustained, and counsel moved for a mistrial, stating:  "The witness has stated that the witness lineup was generated from a previous incident.  Since it obviously involves law enforcement, it obviously would involve a photo lineup to be generated.  Obviously we're talking about a prior crime that they were investigating.  That's what the jury just heard."  (Ex. D, p. 242).  The trial judge advised counsel that the motion for mistrial was taken under advisement.  (Ex. D, pp. 243, 244, 245).  The judge then gave this curative instruction:  "Ladies and gentlemen, thanks for being patient with us.  Please disregard the last answer given."  (Ex. D, p. 246).

The third instance involved Deputy McLemore's testimony.  McLemore testified after Deputy Smith.  During Deputy Smith's testimony, the prosecutor asked whether, on the night of the incident, Smith requested that other units respond

to petitioner's residence after Mr. Hallman and Mr. Prosen identified petitioner out of a photo lineup as the person who assaulted them:

> Q.  (By Mr. Lusko)  Do you know if units – did they go over to Mr. Montgomery's house?
>
> A.  [Deputy Smith]  Did I actually witness them do it, no sir.
>
> Q.  Okay.  Did you have other units respond over there?
>
> A.  Yes, sir.  On the radio I asked other units to respond to the house.
>
> Q.  Was Mr. Montgomery – was he arrested that night?
>
> A.  No, sir.

(Ex. D, pp. 248-249).  Deputy McLemore was one of the officers who responded to petitioner's residence.  Deputy McLemore testified:

> Q.  [Prosecutor Lusko]  And around 4:00 a.m., did you respond to an address over – I believe it was off of Baywoods?
>
> A.  [Deputy McLemore]  Yes, sir.
>
> Q.  Okay.  Were you dispatched there in reference to a case with Deputy Smith?
>
> A.  Yes, sir.
>
> Q.  And whose residence did you respond to?
>
> A.  I don't recall her name.
>
> Q.  Okay,  Well, I'm asking on Baywoods –

MR. CRAWFORD:  Objection, Your Honor.

THE COURT:  I'll sustain the objection.

Q.  (By Mr. Lusko)  Sir, on Baywoods Drive and Woodchuck – off of Woodchuck, I guess over near Creighton, you responded there at 4:00 a.m.?

A.  Yes – yes, sir.  Okay, yes, sir.

(Ex. D, pp. 255-256).  At a bench conference, defense counsel moved for a mistrial:

MR. CRAWFORD:  I am renewing my motion for mistrial based now, again, to reading things.  He just said responding to "her" address. We heard Rogalski earlier – let me finish.  We heard Rogalski earlier. We heard the next witness, Amanda Smith, talk about the incident and photo lineup.  It's just compounding on compounding, Your Honor.  At what point in time does my client's fair trial right come?

(Ex. D, p. 257).  The prosecutor responded:  "He never said whose house it was or anything like that.  He didn't say Rogalski's house or anyone's [sic] else's.  He just said we responded to "her" house.  We don't know whether it's the owner of the house, which, in fact, could be because it's his mom's house.  It's Montgomery's mom's house."  (Ex. D, p. 257).  The court advised counsel:  "I've continued to take your motion under advisement.  It's noted."  (Ex. D, p. 257).  The prosecutor resumed his questioning of Deputy McLemore:

Q.  (By Mr. Lusko)  Deputy, at 4:00 a.m., did you respond to Maurice Montgomery's residence?"

A.  Yes, sir.

Q.  Okay.  And is that over off of Baywoods there?

A.  Yes, sir.

 (Ex. D, p. 257-258).  After the State rested, the judge again assured defense counsel:

"Your motion for mistrial is still under advisement.  I think I've got some case law

on it now, but I'll deal with it later."  (Ex. D, p. 319).  After the jury retired for

deliberations, the court denied a mistrial, explaining:

> THE COURT:  Okay, motion for mistrial.  Let me give some
> case cites into the record on the issue about the comment about previous
> incident, I think.  But the record will be clear on what was said by the
> witness.  I've got <u>Williams v. State</u>, 438, 152, Southern 2nd; <u>Johnson
> v. State</u>, 747 So. 2d 436; and <u>Moore v. State</u>, 418 So. 2d 435.  So I'll
> deny it on that basis.

(Ex. D, p. 393).  The three state court appellate cases cited by the trial court ruled

that it was not error to refuse to grant a mistrial because any possible prejudice

occasioned by the implication of an irrelevant collateral crime or prior bad act was

harmless.  In *Williams*, the state appellate court held that the trial court did not err in

denying the defendant's motion for mistrial, because any prejudice was dissipated

by the witness' immediate clarification or explanation, because a jury instruction

cured any error, and because any undissipated prejudice was harmless in light of the

overwhelming evidence of the defendant's guilt. *Williams v. State*, 438 So. 2d 152, 153 (Fla. 3d DCA 1983). In *Johnson*, the state appellate court held that the trial court acted within its discretion in refusing to declare a mistrial because the defendant himself clarified that he had been eliminated as a suspect in the collateral crime that was referenced, because the trial court offered to give a curative instruction, and because the challenged remark was one isolated statement in the context of the entire trial. *Johnson v. State*, 747 So. 2d 436, 438-439 (Fla. 4th DCA 1999). In *Moore*, the state appellate court held that the trial court properly declined to declare a mistrial because the evidence did not necessarily convey that the defendant had committed a prior crime and any jury instruction would have cured the error. *Moore v. State*, 418 So. 2d 435, 436 (Fla. 3d DCA 1982).

Respondent concedes petitioner exhausted his state court remedies by presenting this claim in his direct appeal. (Doc. 19, p. 28). Respondent goes on to argue, however, that the First DCA's summary affirmance should be construed as a rejection of petitioner's claim on an independent and adequate state procedural ground – that it was not properly preserved for appellate review because defense counsel did not seek a ruling on his motion for mistrial until <u>after</u> the jury retired to deliberate, which was too late under Florida law. (Doc. 19, pp. 31, 32). Respondent

argues that even if the issue was properly preserved, petitioner cannot show that the state court's denial of relief on this claim was contrary to, or involved an unreasonable application of, clearly established federal law.  (*Id*.).

A.    Exhaustion and Procedural Default

The Supreme Court has held that "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.  The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Richter*, 562 U.S. at 99-100 (*citing Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991)).  The *Richter* Court's reference to *Ylst*, is to this portion of the opinion:

> Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.  If an earlier opinion "fairly appear[s] to rest primarily upon federal law," *Coleman*, 501 U.S., at 740, 111 S. Ct., at 2559, we will presume that no procedural default has been invoked by a subsequent unexplained order that leaves the judgment or its consequences in place.  Similarly where, as here, the last reasoned opinion on the claim explicitly imposes a procedural default, we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits.

*Ylst*, 501 U.S. at 803.

Respondent has not rebutted the *Richter* presumption by showing that it is more likely that the First DCA declined to review petitioner's claim because defense counsel failed to preserve the issue. The trial transcript reveals that defense counsel timely moved for a mistrial; that defense counsel was assured by the trial court that his motion was taken under advisement; and that it was the trial judge who controlled the timing of her ruling. (Ex. D). In addition, the applicability of respondent's proposed procedural bar was a disputed, extensively briefed issue on direct appeal that could have been resolved in either party's favor. (Exs. E, F, G). Both parties on direct appeal alternatively addressed the merits of petitioner's claim. (*Id.*). Viewing the record as a whole, this court cannot say that it is more likely petitioner's claim was rejected on state procedural grounds. Nor can this court conclude that the imposition of such a procedural bar would be considered adequate to support the judgment. *See Siebert*, *supra*. As respondent has not rebutted the *Richter* presumption, the court will presume that the First DCA adjudicated petitioner's claim on the merits.

B.    Merits

The following review of petitioner's claim under the § 2254 standard gives petitioner the benefit of the doubt that his merely labeling his claim one of "due

process and a fair trial, U.S. Const Amend. 14", without more, is sufficient to transform a purely state law issue into one of federal constitutional dimension.[3] The issue here is not whether Florida's evidence code or the Federal evidence code prohibited admission of the testimony petitioner challenges. Nor is the issue whether the United States Constitution prohibited the testimony. Under the AEDPA, the issue is only whether the First DCA's rejection of petitioner's claim was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1).

No decision of the United States Supreme Court establishes that admitting (or excluding with a curative instruction) evidence of the kind here (suggesting a prior bad act) accompanied by the clarifications and instructions of the kind given here, was so unfair as to violate a defendant's due process rights. Importantly, habeas review asks only whether the state court's decision was contrary to or unreasonably

---

[3] Petitioner's memorandum supporting his federal habeas petition (doc. 2) is petitioner's only pleading (filed in state court or here) that discusses federal law in conjunction with this claim. Petitioner's counseled direct appeal brief analyzed the issue under Florida law. (Ex. E). Even in petitioner's federal habeas memorandum, however, petitioner does not address the issue in constitutional terms. Petitioner discusses Federal Rule of Evidence 404 and Eleventh Circuit cases interpreting that rule, all of which analyze the issue under the abuse of discretion standard applicable to direct appellate review of federal trial court evidentiary rulings, and the 3-prong test for federal courts applying Rule 404. None of the cases petitioner cites finds a constitutional violation or sets forth a federal constitutional standard. The federal cases petitioner cites hold either that the evidence was properly admitted under Rule 404, or that although the evidence was prohibited by Rule 404, the error was harmless.

applied federal law that was clearly established by the Supreme Court, not whether a federal court, in its independent judgment, agrees with the state court's application of federal law in an area where there is no clear answer. *See Renico v. Lett*, 559 U.S. 766, 773, 130 S. Ct. 1855, 176 L. Ed. 2d 678 (2010) ("[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." (internal quotation marks omitted)); *Wright v. Van Patten*, 552 U.S. 120, 126, 128 S. Ct. 743, 169 L. Ed. 2d 583 (2008) ("Because our cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established federal law.") (internal quotation marks omitted); *Schriro v. Landrigan*, 550 U.S. 465, 478, 127 S. Ct. 1933, 167 L. Ed. 2d 836 (2007) (holding that the Arizona Supreme Court did not unreasonably apply federal law because "we have never addressed a situation like this."); *see also, e.g., Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1287-88 (11th Cir. 2012) (denying federal habeas relief on claim that prosecutor's comments during closing argument deprived the petitioner of a fair trial, holding; "[T]he Supreme Court has never held that a prosecutor's closing arguments were so unfair as to violate the right of a defendant to due process.

. . . The Supreme Court has reiterated, time and again, that, in the absence of a clear answer – that is, a holding by the Supreme Court – about an issue of federal law, we cannot say that a decision of a state court about that unsettled issue was an unreasonable application of clearly established federal law.").

The First DCA's decision was not contrary to, nor an unreasonable application of, clearly established federal law.  Petitioner is not entitled to federal habeas relief on Ground Two.

Ground Three        "The trial court fundamentally erred in imposing a harsher sentence after participating in plea negotiations, raising a presumption of legal vindictiveness, and depriving the defendant of due process of law, U.S. Const. Amend 14." (Doc. 1, p. 13).

Petitioner claims his right to due process was violated when the trial court participated in plea negotiations and, after negotiations failed, imposed a harsher sentence than would have resulted had petitioner accepted the proposed plea. Petitioner puts forth the following allegations to support his claim.

Prior to trial, and when petitioner was proceeding *pro se*, the trial judge inquired about plea negotiations.  The State offered to allow petitioner to plead straight-up to the court to an offense not involving a firearm, for a 3-year non-enhanced prison sentence.  Petitioner declined the opportunity.  Just before trial, the trial judge inquired about the prosecutor's willingness to renew the plea offer so

petitioner could consult with his newly-appointed attorney Mr. Crawford. Petitioner again declined to enter a plea. After being found guilty at trial, the trial judge adjudicated petitioner an HFO and PRR, and sentenced him to a total term of 10 years in prison with a 5-year mandatory minimum. Petitioner contends that this sentence is presumptively vindictive and that the only constitutionally permissible sentence was either the 3 years offered by the State or the 5-year PRR sentence mandated by law and requested by the defense at sentencing. (Doc. 1, p. 14). Respondent concedes that petitioner exhausted this claim by presenting it in his direct appeal. (Doc. 19, p. 34). Respondent argues that petitioner is not entitled to federal habeas relief because the state court's rejection of the claim was not contrary to or an unreasonable application of clearly established federal constitutional law. (*Id*., pp. 34-41).

A.    Clearly Established Federal Law

In *North Carolina v. Pearce*, 395 U.S. 711, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969), the United States Supreme Court held that it is "patently unconstitutional" to penalize criminal defendants who successfully have a criminal conviction set aside on appeal by imposing a harsher sentence after retrial. *Id*. at 724. As a prophylactic measure "to assure the absence of such a motivation," the *Pearce* Court

held that "whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must affirmatively appear" on the record. *Id*. at 726.

*Pearce* was overruled in part by *Alabama v. Smith*, 490 U.S. 794, 109 S. Ct. 2201, 104 L. Ed. 2d 865 (1989). In *Smith*, the Court held that the *Pearce* presumption of vindictiveness does not arise "when the first sentence was based upon a guilty plea, and the second [harsher] sentence follows a trial." *Id*. at 796. The *Smith* Court explained that the *Pearce* presumption is appropriate only in circumstances "in which there is a 'reasonable likelihood' that the increase is the product of actual vindictiveness on the part of the sentencing authority. Where there is no such reasonable likelihood, the burden remains upon the defendant to prove actual vindictiveness." *Id*. at 799 (citations omitted). The *Smith* Court found there was no reasonable likelihood of vindictiveness in instances where a defendant is given a harsher sentence after trial than was imposed upon a prior guilty plea because "the relevant sentencing information available to the judge after the plea will usually be considerably less than that available after trial." *Id*. at 801 (noting that vindictiveness cannot be presumed "[e]ven when the same judge imposes both sentences"). Importantly, the Supreme Court has not addressed, much less held, that

the *Pearce* presumption of judicial vindictiveness applies when a defendant rejects

a judicially-approved plea offer, goes to trial, and receives a harsher sentence after

trial than was available to him under the rejected plea offer.

The majority of federal circuit courts, including the Eleventh Circuit, have

held that the *Pearce* presumption has <u>no</u> application in the plea bargaining context.

*Hitchcock v. Wainwright*, 770 F.2d 1514 (11th Cir. 1985) (holding that the *Pearce*

presumption was inapplicable in the plea bargaining context), *reversed on other*

*grounds, Hitchcock v. Dugger*, 481 U.S. 393, 107 S. Ct. 1821, 95 L. Ed. 2d 347

(1987); *see also United States v. Morrison*, 153 F.3d 34 (2d Cir. 1998) (holding that

the *Pearce* presumption was inapplicable where the defendant received a harsher

sentence after withdrawing his guilty plea and proceeding to trial); *Waring v. Delo*,

7 F.3d 753 (8th Cir. 1993) (same); *United States v. Taglia*, 925 F.3d 1031 (7th Cir.

1991) (holding that the *Pearce* presumption was inapplicable where the defendant

received a harsher sentence on remand after successfully moving to vacate his guilty

plea); *United States v. Lippert*, 740 F.2d 457 (6th Cir. 1984) (rejecting the automatic

application of the *Pearce* presumption in the context of plea agreements); *Frank v.*

*Blackburn*, 646 F.2d 873 (5th Cir. 1980) (holding that the *Pearce* presumption was

inapplicable in light of Supreme Court precedent that the government is free to

encourage guilty pleas by offering substantial benefits and threatening a defendant with more severe punishment), *opinion modified on other grounds*, 646 F.2d 902 (5th Cir. 1981); *see also, e.g., Creed v. Dep't of Corr.*, 330 F. App'x 771 (11th Cir. 2009) ("The imposition of a longer sentence than a defendant would have received had he pleaded guilty does not automatically amount to punishment for the defendant's exercising his right to stand trial.  A trial judge may reasonably increase a defendant's sentence after trial because the trial gives the judge the benefit of hearing testimony, becoming aware of the facts of the case, and understanding the flavor of the event and the impact upon any victims."  (internal quotation marks and citations omitted)).

Petitioner cites *United States v. Corbitt*, 996 F.2d 1132 (11th Cir. 1993), and *United States v. Tobin*, 676 F.3d 1264 (11th Cir. 2012), for the proposition that a presumption of vindictiveness applies.  (*See* Doc. 2, p. 6).  Those cases, however, dealt with defendants obtaining relief from their guilty pleas on the grounds that judicial participation in plea discussions caused them to forego their right to go to trial and to enter the plea.  That is not the case here and, in any event, the rule established by those cases was abrogated by *United States v. Davila*, — U.S. —, 133

S. Ct. 2139, 2149, 186 L. Ed. 2d 139 (2013). *See United States v. Castro*, 736 F.3d 1308, 1313 (11th Cir. 2013) (recognizing the abrogation).

B.    Review of State Court's Decision

Petitioner raised this claim as Issue IV in his direct appeal. (Ex. E). The First DCA silently affirmed petitioner's judgment and sentences. (Ex. H). Under the *Richter* test, petitioner must establish there was no reasonable basis for the First DCA to reject his judicial vindictiveness claim. Petitioner has not made that showing.

As discussed above, although petitioner argues that a presumption of vindictiveness applies to his claim, no United States Supreme Court case so holds. The First DCA's rejection of petitioner's claim was not contrary to clearly established federal law.

Similarly, petitioner has not shown that the First DCA's decision involved an unreasonable application of clearly established federal law. Petitioner has made no colorable showing of actual vindictiveness, and the record does not even hint at vindictiveness.

During a pre-trial hearing on September 23, 2011, after petitioner elected to represent himself, the trial judge (Judge Shackelford) conducted a *Faretta* colloquy,

accepted petitioner's election to proceed *pro se*, and informed petitioner of the nature of the charges against him and the maximum possible penalties. (Ex. A, pp. 12-30). The trial judge did not initiate or participate in plea negotiations.

One month later, on October 20, 2011, the parties appeared at another pre-trial hearing. Petitioner raised the issue of plea negotiations and informed the court that he had rejected a plea offer, made a counteroffer, but no agreement was reached. (Ex. A, pp. 56-57). Petitioner expressed confusion over the prosecutor's calculation of his sentence scoresheet, and requested that previously appointed stand-by counsel (Attorney Ibanez) be made co-counsel for the purpose of conducting plea negotiations. (*Id.*, p. 58). The trial court did not participate in plea negotiations, but instead asked Attorney Ibanez to review petitioner's scoresheet with the prosecutor and then explain the scoresheet to petitioner. (*Id.*, pp. 58, 60-61).

A few weeks later on November 10, 2011, during another pre-trial hearing, the issue of the parties' plea negotiations was discussed after the court denied petitioner's motion to dismiss the charges and to suppress evidence, and petitioner insisted he was innocent of the charges because he never possessed a firearm during the incident with Mr. Hallman and Mr. Posen. The trial judge noted the history of the parties' plea negotiations, then explained:

THE COURT:  Okay.  But the case is still pending.  Now, what I want to talk to you about is something else, because I'm going to just, you know, either consider your motion to suppress argued and denied, or withdrawn.  But Mr. Lusko [the prosecutor], at some point, made some offer to you that involved a three year state prison sentence, and I don't know that that offer involved a firearm or just involved pleading to, like, an aggravated assault, or a threat with a car, or how you were going to do it.

But, Mr. Montgomery, obviously, you don't want to accept anything.  I don't know if Mr. Lusko can offer something that doesn't involve the firearm since that's his big bone of contention, but I think he's talked to you about a three year prison sentence.  You know you're facing life.  You could go to trial and very well be found not guilty, okay.  But if you're not found not guilty, you know you're facing serious consequences.

So what I'm saying to you is that I'm asking Mr. Lusko to look at what his offer was and see if he'll renew it to you, and I'm going to give you till Tuesday, if you want to take it.  If you don't want to take it after  – because it's a downward departure.  Any offer he makes is a downward departure, and I have to approve it.

Is there an offer you can make that does not involve a firearm?

MR. LUSKO:  Your Honor, I could – I could make an offer on just the agg assault.  I think when I originally made that offer, even then it was a downward departure, and I had used the possession of a firearm by a convicted felon.  That was what I had used as the primary offense because that actually scores lower than the aggravated assault, with a weapon does.  There was the three year min. man that was on that, but I could do an agg assault just based upon the vehicle.  Again, that would be – I think that's going to score out to 36 points which is higher than the convicted felon with the possession of a firearm, which was 28 points.  So I could do that and –

THE COURT:  Well –

MR. LUSKO:  – offer it down to a three year, but, again, that would be something I would –

THE COURT:  Mr. Montgomery, he can make you – I mean, I'm the one that has to approve it.  He can make you an offer to plead to me, and I could sentence you to three years in state prison and not involve a firearm in any of the counts or the count that you plead to.  And you can do it today.  You can do it Tuesday.  After, that, I don't promise that I'll do anything.

So if you want to sit down with Mr. Lusko for a moment.  And then you would not be entering a plea to anything involving a firearm, because that is what you're saying.  But you know that you and I have had many experiences together and losing your temper and getting upset, which is part of what these allegations involve, also, is some – some – losing of your temper, potentially, and following people and that sort of thing is something that's not – at least I've seen you lose your temper.

So if you want to sit down for a moment and talk with Ms. Ibanez and Mr. Lusko, and we can drop the firearm aspect of it so that you're not having heartburn. . . . I know that you're saying you did none of it. I understand that, but you know you're facing life.

(Ex. A, pp. 86-89).  Petitioner responded:

THE DEFENDANT:  You're talking about giving me time.  What I'm saying, Your Honor, I heard your – his offer.  What I want to offer to the Court – I made a[n] offer to Mr. Lusko that I said I would plea out. I don't care about you having the conviction on my record, but I didn't want to go to prison.  I told him I'd take a long term of supervision, Your Honor.

THE COURT:  Okay.

THE DEFENDANT:  I'm – I'm not –

THE COURT:  I'm not going to approve that, so.

THE DEFENDANT:  Well, I'm not – Your Honor, I'm not going to prison for something I didn't do.

THE COURT:  Okay.

THE DEFENDANT:  That – that – you just give me a life sentence, Judge Shackelford, and I'll file the motion for the recuse.  I'm not going to prison for something I didn't do.

THE COURT:  Okay.

THE DEFENDANT:  I'm not going to do that.  There's no way in the world I'd do that, and everybody want me to just go to prison.  Why I can't get supervision?  I never – I'm offering it.  Just for something I didn't even do, I said I'd take supervision for disorderly conduct, time served, and take a large sum of supervision.  You know about violating supervision.  You're putting me away the rest of my life, anyway.  I'm putting my life on the line to show you that I didn't do it.

THE COURT:  Okay.  I understand you're entering a plea of not guilty.

(Ex. A, pp. 90-91).

After petitioner went to trial and was convicted of simple assault on Counts 2 and 3, and of aggravated assault by threat with a vehicle as charged in Counts 4 and 5, he appeared for sentencing.  Petitioner stipulated to the sentencing scoresheet, which reflected total sentence points of 95.7, and a lowest permissible sentence of

50.78 months in prison.  (Ex. A, pp. 156, 169-172).  The State introduced evidence of petitioner's qualification as a HFO and a PRR.  (Ex. A, pp. 155-159).  Petitioner's qualification as a HFO increased his sentencing exposure from 5 years to 10 years on the aggravated assaults.  Petitioner's qualification as a PRR required a 5-year mandatory minimum.  The State requested a sentence of 10 years in prison on Count 4 with a 5-year mandatory minimum, and a sentence of 5 years in prison on Count 5.  (Ex. A, p. 160).  The defense requested a total sentence of 5 years as a PRR.  (Ex. A, p. 163).  The trial court addressed petitioner prior to imposing sentence:  "Mr. Montgomery, you know, we've been together my entire judicial career, really, and you know it's not a good day today.  And I was not happy to see you back with me, but now I have to do what I have to do."  (Ex. A, p. 164).   The court found that petitioner met the criteria for adjudication as a HFO and a PRR, adjudicated him as such, and sentenced him on Count 4 as a HFO and a PRR to 10 years in prison with a mandatory 5-year minimum.  The court sentenced petitioner on Count 5 under the Criminal Punishment Code, to 5 years in prison.  The court sentenced petitioner to time served on Counts 2 and 3.  (Ex. A, pp. 164-166).  Petitioner's adjudication as a HFO required the court to sentence him to 10 years in prison, absent findings (including written reasons) why such sentencing was not necessary for the protection

of the public.  Fla. Stat. § 775.084(3)(a)-(4)(a).  Petitioner's adjudication as a PRR

required the court to impose a 5-year minimum prison sentence.  Fla. Stat. §

775.082(9)(a).  Petitioner's criminal history included 19 prior felonies.  (Ex. A, pp.

169-172).  Petitioner's prior convictions included crimes of assault, aggravated

stalking by credible threat, and burglary of an occupied dwelling, (Ex. A, pp. 169-

172 (stipulated sentencing scoresheet); Ex. B, pp. 210-253 (certified copies of

judgments and sentences and Florida Department of Corrections' records)).  The

trial court did not impose the maximum permissible sentence, even though it had the

authority to do so and petitioner's extensive criminal record would have supported

it.

Petitioner presents no evidence, other than the fact of his sentence, to support

his claim that Judge Shackelford imposed a heavier sentence as a punitive action for

him exercising his right to go to trial.  The record contains not even a remote

suggestion of vindictiveness.  To the contrary, the record reveals Judge

Shackelford's generous accommodation of petitioner's desire to be heard throughout

pretrial and trial proceedings, her efforts to ensure petitioner understood the

consequences of his decisions, and her demonstrated respect for petitioner's exercise

of his constitutional rights (to be heard, to represent himself, to be represented by

counsel, to require the State to prove its case, and to be tried by an impartial jury).

Judge Shackelford's comments and actions at sentencing, coupled with her

knowledge of the evidence presented at trial and petitioner's undisputed extensive

criminal history, indicate her adherence to governing legislative and constitutional

requirements. (Ex. A, pp. 155-167).

The First DCA's rejection of petitioner's claim was not contrary to, nor an

unreasonable application of, clearly established federal law.  Petitioner is not entitled

to federal habeas relief on Ground Three.

| Ground Four | "The cumulative effect of the trial court's errors deprived the defendant of due process and a fair trial, U.S. Const. Amend. 14." (Doc. 1, p. 16). |

Petitioner alleges in support of this claim that "if this court does not consider

any of the issues presented singly to require reversal and remand for a new trial based

on a harmless error analysis, then the cumulative effect of all of the errors does so

require." (Doc. 1, p. 16).  Petitioner goes on to reiterate his contentions made in

Grounds One through Three above.  Respondent asserts that petitioner's "cumulative

error" claim is not cognizable on federal habeas review and, even if cognizable, does

not warrant federal habeas relief because none of petitioner's individual claims

establish error.  (Doc. 19, pp. 41-42).

The Eleventh Circuit has rejected similar "cumulative error" claims asserted in federal habeas actions. *See, e.g., Insignares v. Sec'y, Fla. Dep't of Corr.*, 755 F.3d 1273 (11th Cir. 2014). The court in *Insignares* explained:

> Insignares claims cumulative error deprived him of a fair trial. Under the cumulative-error doctrine, a sufficient agglomeration of otherwise harmless or nonreversible errors can warrant reversal if their aggregate effect is to deprive the defendant of a fair trial. *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012). "This court has made clear that where '[t]here [is] no error in any of the [trial] court's rulings, the argument that cumulative trial error requires that this Court reverse [the defendant's] convictions is without merit.'" *Id.* (*quoting United States v. Taylor*, 417 F.3d 1176, 1182 (11th Cir. 2005) (per curiam)) (alterations in original). Because we have found no error in the issues on appeal, Insignares has failed to show that the state judge lacked a reasonable basis to deny his cumulative-error claim.

*Id.* at 1284; *Morris*, 677 F.3d at 1132 ("Plainly, Morris's cumulative error claim must fail. As demonstrated above, none of Morris's individual claims of error or prejudice have any merit, and therefore we have nothing to accumulate.").

Even assuming, without deciding, that petitioner's "cumulative effect" claim is cognizable on federal habeas review, the claim provides no basis for federal habeas relief. Petitioner raised his "cumulative effect" claim as Issue VIII in his direct appeal. (Ex. E). The First DCA summarily affirmed the judgment. (Ex. H). Because neither the First DCA nor this court has found any error at all in the issues raised in Grounds One through Three above, petitioner has not shown that the First

DCA lacked a reasonable basis to deny his cumulative effect claim. Petitioner is not entitled to federal habeas relief on Ground Four.

Ground Five          "Defense counsel rendered ineffective assistance by failing to object to comments on defendant's right to remain silent." (Doc. 1, p. 18).

Petitioner alleges that during closing argument, the prosecutor improperly commented on his decision not to testify when the prosecutor remarked:

[Prosecutor]:  You heard from Ramon [victim Hallman] it was a gun.

You haven't heard any, any reason why they would make this up. There hasn't been a single thing to suggest why they would make this up.  The defense attorney couldn't tell you that.

MR. CRAWFORD [Defense counsel]:  Objection, Your Honor.  This is shifting the burden.

MR. LUSKO [Prosecutor]:  You heard his argument –

THE COURT:  I'll overrule the objection.

MR. LUSKO:  You heard his argument – you heard him question the witnesses today.  There was nothing in – in his closing argument, there was a question today to establish why they would have a motive to make this up.  Ladies and gentlemen, they reported this because this is exactly what happened to them.

. . . .

You haven't heard a single reason for these two kids to lie about that.  You haven't heard any evidence of them lying about that.

. . . .

> The Defense made statements to you in opening statement.  You didn't hear any evidence from those witnesses that supported that.  What he said in opening statement is not to be considered by you.  That is not evidence.

 (Ex. D, pp. 371, 375).  Respondent concedes that petitioner exhausted this claim by raising it in his Rule 3.850 proceeding.  (Doc. 19, p. 43).  Respondent argues that petitioner is not entitled to relief because he fails to meet § 2254(d)'s high standard.  (Doc. 19, pp. 43-48).

A.     Clearly Established Federal Law

In *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Supreme Court set out a two-part inquiry for ineffective assistance of counsel claims.  The petitioner must show that (1) his counsel's performance was constitutionally deficient, and (2) the deficient performance prejudiced him.  466 U.S. at 687.  "First, petitioner must show that 'counsel's representation fell below an objective standard of reasonableness.  Second, petitioner must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  *Darden v. Wainwright*, 477 U.S. 168, 184, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986) (*quoting Strickland*, 466 U.S. at 694).

Trial counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. The burden to overcome that presumption and to show that counsel's performance was deficient "rests squarely on the defendant." *Burt v. Titlow*, 571 U.S. —, 134 S. Ct. 10, 17, 187 L. Ed. 2d 348 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 189, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011) ("To overcome that presumption, a defendant must show that counsel failed to act reasonably considering all the circumstances." (quotation marks and alterations omitted)). "[T]he absence of evidence cannot overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *Titlow*, 134 S. Ct. at 17 (quotation marks and alterations omitted).

With regard to prejudice, the *Strickland* court emphasized that a defendant must show a "reasonable probability" of a different result. A reasonable probability is one that sufficiently undermines confidence in the outcome. *Strickland*, 466 U.S.

at 694. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

When a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *Strickland*, 466 U.S. at 698; *Collier v. Turpin*, 177 F.3d 1184, 1197 (11th Cir. 1999). "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 562 U.S. at 105. As the Court in *Richter* explained:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Id.* (citations omitted).

B.    Review of State Court Decision

Petitioner raised this claim as Ground 4 of his amended Rule 3.850 motion.

The state circuit court identified the governing legal standard as the *Strickland*

standard (Ex. N, pp. 284-285), and denied relief as follows:

**GROUND 4**

Referring to pages 371 and 375 of the trial transcript, Defendant claims counsel was ineffective for failing to object to comments made by the prosecution on Defendant's right to remain silent.  During closing arguments, the prosecution stated one of the victims Ramon Hallman testified "it was a gun" and the jury had not heard any reasons "they would make this up."  (Exhibit B, p. 371.)  Trial counsel objected on the basis the State was shifting the burden, and the objection was overruled.  (Exhibit B, p. 371.)  The prosecution further stated the jury had not heard any reason for the witnesses to "lie about that," and it had not heard evidence to support certain statements made by the defense in opening.  (Exhibit B, p. 375.)  Trial counsel did not object to these subsequent statements.

During opening statements, trial counsel recounted facts amounting to Defendant's version of the incident in question.  (Exhibit B, pp. 218-220.)  The State objected on the basis such facts would have to come from Defendant, but counsel assured he had a good faith basis to believe the facts would be coming into evidence and was allowed to proceed.  (Exhibit B, p. 218.)  After Defendant chose not to testify, the State argued it should be allowed to comment in closing there was no evidence to support the allegations made by the defense in opening, and trial counsel and the trial court agreed.  (Exhibit B, pp. 324-326.)

In light of the trial court's ruling prior to closing arguments and overruling counsel's objection to the first comments, there is no reasonable probability of a different ruling had counsel objected to the

subsequent statements.  Otherwise, taken in context, the prosecution's
statements were a comment on the lack of evidence and not a comment
on Defendant's failure to testify.  *See Bell v. State*, 108 So. 3d 639, 647-
648 (Fla. 2013).

(Ex. N, pp. 286-287).  The First DCA summarily affirmed.  (Ex. O).

The relevant decision for purposes of 28 U.S.C. § 2254 is the First DCA's
summary affirmance, which is the final state court adjudication on the merits of
petitioner's claim.  *Wilson*, 834 F.3d at 1235 (defining the relevant decision for
purposes of § 2254 review as the state appellate court's summary affirmance of the
lower tribunal's decision).  This court reviews the First DCA's decision using the
test announced in *Richter*.  *Wilson* at 1235.

The Fifth Amendment guards a criminal defendant's right against self-
incrimination, and to this end, a prosecutor may not comment on the defendant's
failure to testify.  *Griffin v. California*, 380 U.S. 609, 615, 85 S. Ct. 1229, 1233, 14
L. Ed. 2d 106 (1965).  A defendant's rights are violated where the prosecutor's
statement was either "manifestly intended to be a comment on the defendant's failure
to testify," or "of such a character that a jury would naturally and necessarily take it
to be a comment on" the defendant's silence.  *Isaacs v. Head*, 300 F.3d 1232, 1270
(11th Cir.2002) (internal quotation marks omitted).

The First DCA reasonably could have concluded that counsel was not deficient for failing to object on the ground petitioner proposes (that the prosecutor commented on his failure to testify). Taken in context, the prosecutor's statements were not a comment on petitioner's decision not to testify, but on the defense's failure to impeach the victims' credibility and failure to counter or explain the evidence presented. "A comment on the failure of the *defense*, as opposed to that of the *defendant*, to counter or explain the testimony presented or evidence introduced is not an infringement of the defendant's fifth amendment privilege." *Duncan v. Stynchcombe*, 704 F.2d 1213, 1215-16 (11th Cir. 1983) (*citing United States v. Dearden*, 546 F.2d 622, 625 (5th Cir. 1977)). The First DCA also reasonably could have concluded that counsel's failure to object on petitioner's proffered grounds did not result in prejudice because, not only was the objection without merit, any possible prejudice was cured by the trial court's jury instructions concerning petitioner not testifying and the burden of proof. (Ex. A, pp. 143, 145).

The state court's rejection of petitioner's claim was not contrary to, and did not involve an unreasonable application of, the *Strickland* standard. Nor was the decision based on an unreasonable determination of the facts. Petitioner is not entitled to federal habeas relief on Ground Five.

Ground Six        "Defense counsel rendered ineffective assistance by leading
                  defendant to believe his testimony was unnecessary in support of
                  his defense, causing defendant to waive his right to testify."
                  (Doc. 1, p. 20).

Petitioner alleges that he was prepared to testify during trial "to rebut the alleged victim's testimony and explain his side of the incident", but after the State rested, defense counsel misadvised him that his testimony was unnecessary because "the State's case was weak, and counsel could rebut the evidence on his own during closing arguments. In addition, defense counsel led Defendant to believe that if he did testify, the State would be permitted to elicit the specific nature of Defendant's prior convictions." (Doc. 1, p. 20). Petitioner contends that counsel's deficient advice caused him to waive his right to testify. Respondent concedes that petitioner exhausted this claim by raising it in his Rule 3.850 proceeding. (Doc. 19, p. 49). Respondent argues that petitioner is not entitled to relief because he fails to meet § 2254(d)'s high standard. (Doc. 19, pp. 49-53).

A.     Clearly Established Federal Law

The clearly established federal law governing claims of ineffective assistance of counsel is the *Strickland* standard, as set forth above.

B.     Review of State Court Decision

Petitioner raised this claim as Ground 13 of his amended Rule 3.850 motion.

The state circuit court identified the *Strickland* standard and denied relief as follows:

**GROUND 13**

Defendant claims counsel was ineffective by leading defendant to believe his testimony was unnecessary to support his defense, causing him to waive his right to testify. Defendant alleges he would have testified the victims were closely following him with high beams on; he pulled over and exited his car and approached them and told them to pass; and he questioned them whether they were trying to kill him, then followed them to try to get the license plate number of their vehicle. He further alleges he had an eyeglass case and not a gun and never threatened the victims.

At trial, Defendant told the trial court it was his free choice not to testify. (Exhibit B, p. 321.) Defendant affirmed he understood his counsel made statements in opening about Defendant's case that could only come out if he testified. (Exhibit B, p. 322.) There was also discussion between the attorneys and the trial court that the facts discussed in opening by the defense were not in evidence and the State could comment on this fact. (Exhibit B, pp. 323-327.) The record shows defendant's decision not to testify was not based on misadvice of counsel.

Also, the record shows defendant was not prejudiced by his failure to testify. The victims testified defendant was standing in the street outside his car parked on the side of the road; they had not followed him; they recognized him as a neighbor of Hallman; Defendant verbally threatened them as they drove by; he got back in his car and chased them and at one point pulled up alongside them; they were afraid; they drove to a nearby drugstore to get help; and they called the police. (Exhibit B, pp. 264-272, 289-300.) Deputy Smith testified

the victims were afraid. Deputy McLemore testified he went to Defendant's residence at about 4:00 a.m., where he found a vehicle matching the description he was given, and the hood of the vehicle was warm. (Exhibit B, pp. 257-258.) He further testified the lights and television were on inside the residence, but no one responded to him when he knocked on the door and rang the bell, although he identified himself as law enforcement. (Exhibit B, pp. 259, 262-262.) Defendant alleges in Ground 15 the jury was out for approximately 27 minutes.

Although Defendant alleges he did not have a gun and never threatened the victims, Defendant's proposed testimony would confirm he spoke to the victims from outside his car parked on the side of the street; he got back in his car and followed them, trying to get close enough to see the license plate; and they sped away from him. Also, the prosecution would have been able to introduce the number of his prior convictions. According to the trial and sentencing transcripts, Defendant's prior convictions and crimes of dishonesty were numerous. (Exhibit B, p. 322; Exhibit D, pp. 2-4.) His scoresheet indicates 19 prior felonies. (Exhibit G.) The number of Defendant's convictions was a factor in his decision not to testify. (Exhibit B, p. 326.)

Defense counsel pointed out there was no physical evidence to corroborate the victims' testimony, and it was the State's burden to prove all the elements. (Exhibit B, pp. 360-361.) Counsel argued strongly the evidence did not support the use of a firearm, and Defendant was not convicted of a firearm offense. (Exhibit B, pp. 362-365.) The State argued there was no evidence to show a reason for the victims to lie about the offense. (Exhibit B, p. 375.)

Defendant's proposed testimony also does not show a reason for the victims to fabricate a story about being threatened or chased by Defendant. Based on the circumstances and the weight of the evidence against Defendant, there is no reasonable probability of a different outcome had he testified as alleged.

Defendant also alleges counsel advised the State would be permitted to elicit the specific nature of Defendant's prior convictions. This part of his claim is further raised and addressed in Ground 14.

**GROUND 14**

Defendant claims counsel was ineffective by leading defendant to believe the State would be permitted to elicit the specific nature of Defendant's prior convictions, which in turn led Defendant to waive his right to testify. As discussed above, there is no reasonable probability of a different outcome had he testified as alleged.

(Ex. N, pp. 292-294). The First DCA summarily affirmed. (Ex. O).

A criminal defendant has a "fundamental constitutional right to testify in his or her own behalf at trial," and that "right is personal to the defendant and cannot be waived either by the trial court or by defense counsel." *United States v. Teague*, 953 F.2d 1525, 1532 (11th Cir. 1992). Deficient performance may be established "where counsel has refused to accept the defendant's decision to testify and refused to call him to the stand, or where defense counsel never informed the defendant of his right to testify and that the final decision belongs to the defendant alone." *Gallego v. United States*, 174 F.3d 1196, 1197 (11th Cir. 1999).

The trial transcript establishes that prior to commencement of the evidentiary portion of the trial, the trial court and counsel discussed in petitioner's presence the use of his prior convictions for purposes of impeachment:

> THE COURT:  Okay.  Mr. Lusko, impeachable convictions for any witnesses?
>
> MR. LUSKO:  . . . As far as Mr. Montgomery, he has 19 prior felonies and 15 prior misdemeanor convictions for dishonesty.
>
> THE COURT:  Okay.  If he ends up deciding he's going to testify, we'll take a look at that.

(Ex. C, p. 195).  After the State rested and the jury was sent to lunch, the trial judge, in the presence of the attorneys and petitioner, advised defense counsel to meet with petitioner concerning the issue of him testifying.  The court stated:  "Mr. Crawford, if you have any question about the number of convictions that apply, that you and Mr. Lusko huddle up over that."  (Ex. D, p. 319) (emphasis added).  A short time later the judge reiterated:  "[L]ike I said, I think you're looking right now at the convictions, and if there's any issues, let's try to resolve them so we don't have to spend any time on it when we get back."  (Ex. D, p. 320).  When court resumed, the judge inquired, outside the presence of the jury:

> [THE COURT]:  All right.  Mr. Crawford, have you had a chance to talk to Mr. Montgomery about testifying?
>
>          . . . .
>
> MR. CRAWFORD:  Yes, Your Honor.  And Ms. Ibanez had a chance – I was just speaking to him when you walked in about testifying.
>
> THE COURT:  Okay.  Is it his decision to testify[?]

THE DEFENDANT:  On my own free will, I choose not to testify, Your Honor.  It's my free choice.  I choose not to testify.

MR. LUSKO:   Judge, this [is] exactly what I was referring to this morning.

THE COURT:  Mr. Montgomery, raise your right hand.

(Defendant sworn)

THE COURT:  Mr. Montgomery, have you had a chance to talk to your attorneys about the advantages and disadvantages of testifying.

THE DEFENDANT:  Yes.

THE COURT:  And have you also talked to – do you understand it's the State's burden to prove the case beyond a reasonable doubt?

THE DEFENDANT:  Yes.

THE COURT:  That if they don't prove the case beyond a reasonable doubt, the verdict should be not guilty?

THE DEFENDANT:  Yes.

THE COURT:  You understand that if you testify, the jury would found out that [you] have – I don't know if it was agreed to, but at least multiple, many, many prior felonies and many crimes of dishonesty? Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  You also understand, however, that your attorney got up this morning in opening and made statements about this case that it

appears could only have come out if you testified.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  And is it your decision you do not want to testify?

THE DEFENDANT:  Yes.

(Ex. D, pp. 321-322).  This exchange followed:

THE COURT:  Well, I want to say this.  I was very skeptical this morning when I heard the opening because I was having a hard time believing, just based on my limited knowledge of this case, which actually I seem to – you know, we've had a lot of pretrial issues – that the defendant was going to testify.  But I don't have any way of knowing, Mr. Crawford, whether he was really going to testify as of this morning and it changed or if this is all a big strategy and just another thing that Mr. Montgomery is, as he was chuckling on the phone earlier this week about how this case was going to play out, I have no way of knowing it.

So I just have to say that I expect when you make an opening and you make those kind of representations, that you're acting in good faith.  But I don't have any way of knowing whether it was good faith or not, and I'm not asking obviously for you to disclose discussion with your client.

But I will say, Mr. – it sounds like we're all in agreement on one thing, and that is, Mr. Lusko, without commenting on the defendant's right to remain silent, I do believe that you can comment that what the attorneys say in opening and closing is not evidence and that there's been no evidence presented to support the statements made in opening.  But do not comment – you know, the defendant does not have to testify.  So you can just say, you have not received any evidence and you are

not to consider opening statement as evidence, and then you move off of it from there.

MR. LUSKO:  Yes, Judge.

THE COURT:  Now, I think you said you wanted to call two witnesses, so . . .

MR. CRAWFORD:  I think it might just come down to one now that I'm thinking about it.

      For the record, I did prepare a direct for Mr. Maurice [sic].  This was prepared two nights ago.  It's been over with Mr. Maurice [sic].  It's a length of eight pages.  Because of the posture of the case, we did not until today really know exactly <u>how many</u> convictions Mr. Maurice [sic] had.  And not to get into the conversation I had with my client, but we went over direct and we had a direct all written out.  He chose not to testify today.

(Ex. D, pp. 324-326) (emphasis added).

The First DCA reasonably could have concluded, based on these transcripts, that petitioner freely chose not to testify on his own behalf, and that his attorney neither forced him to not testify nor misadvised him.  As to petitioner's contention that he chose not to testify based on defense counsel's incorrect advice that, if he took the stand the prosecutor could ask him about the <u>nature</u> and <u>facts</u> of his prior convictions, the First DCA reasonably could have concluded, based on the transcripts, that petitioner was not misadvised and that he was aware what the prosecutor could, namely, the <u>number</u> of prior felony convictions and the <u>number</u> of

convictions for crimes involving dishonesty or false statement. The on-the-record discussions between the judge, the prosecutor and defense counsel, in petitioner's presence, make clear that the focus was on the <u>number</u> of convictions and not details about their nature.[4]

The First DCA also reasonably could have concluded, based on the lower state court's reasoned analysis, that petitioner failed to establish he was prejudiced by not taking the stand. The lower court accurately described petitioner's proposed testimony and the evidence adduced at trial. Petitioner has not shown that it is reasonably likely his proposed testimony would have resulted in a different outcome on his offenses of conviction (simple assault and aggravated assault with a vehicle) given the State's evidence, the nature of petitioner's proposed testimony, the short

---

[4] Florida law would have prohibited the State from cross-examining petitioner about the <u>nature</u> of his prior felonies, unless he opened the door to that line of questioning. *See Rivera v. State*, 2 So. 3d 1086, 1087 (Fla. 4th DCA 2009). As long as petitioner kept that door shut, questions on cross-examination about his prior felony convictions would have led to the identification of each of them but could not have sought details about their nature. *See id.* ("Questions concerning a defendant's prior convictions are limited to whether the defendant has committed a felony or other offense involving dishonest or false statements, and if the defendant admits such a conviction, how many of such prior convictions." (*citing* Fla. Stat. § 90.610(1))); *see also Burst v. State*, 836 So. 2d 1107, 1108 (Fla. 3d DCA 2003) ("The proper method of impeaching a witness with prior convictions is to first ask whether the witness has ever been convicted of a felony. If the witness admits the conviction, the questioner may ask, "how many times," and whether the witness has ever been convicted of a misdemeanor involving dishonesty. If the witness denies the conviction, the opposing party may produce the record of conviction." (*citing Mosley v. State*, 739 So. 2d 672, 675 (Fla. 4th DCA 1999))).

amount of time it took the jury to reach a verdict, and the State's inevitable cross-examination revealing the number of petitioner's prior convictions for felonies (19) and for crimes involving dishonesty (15).  The reasoning of the state circuit court provides ample basis for concluding that petitioner failed to establish prejudice under *Strickland*.

The First DCA's rejection of petitioner's claim was not contrary to and did not involve an unreasonable application of the *Strickland* standard.  Petitioner is not entitled to federal habeas relief on Ground Six.

Ground Seven    "Defense counsel rendered ineffective assistance by misleading defendant on the State's limited purpose of impeachment on prior convictions, causing defendant to waive his right to testify on his own behalf."  (Doc. 1, p. 23).

This ground reiterates and overlaps with Ground Six, above.  Petitioner asserts that defense counsel misadvised him by "le[ading] defendant to believe that if he did testify, the State would be permitted to elicit the specific nature of Defendant's prior convictions. . . . It was not until after defendant was convicted and sent to prison that he researched the law on impeachment and learned that the State was limited to eliciting the number of defendant's prior convictions, but not the specific nature of the prior convictions."  (Doc. 1, p. 23).  Respondent concedes that petitioner exhausted this claim by raising it in his Rule 3.850 proceeding.  (Doc. 19, p. 54).

Respondent argues that petitioner is not entitled to relief because he fails to meet § 2254(d)'s standard.  (Doc. 19, pp. 54-56).

A.    Clearly Established Federal Law

The clearly established federal law governing claims of ineffective assistance of counsel is the *Strickland* standard, set forth above.

B.    Review of State Court Decision

Petitioner raised this claim as Ground 14 of his amended Rule 3.850 motion. The state circuit court denied relief, as set forth above.  The First DCA summarily affirmed.  As discussed above, the trial transcript shows that petitioner was aware, by discussions in his presence, that the nature of the State's cross-examination concerning his prior convictions was limited to their number, not specific nature. Further, even if defense counsel misadvised petitioner on the subject, the First DCA reasonably could have rejected petitioner's claim on *Strickland's* prejudice prong. Petitioner has not shown there is a reasonable probability he would have testified had he known the prosecutor could elicit the number of his prior convictions but not specifics about their nature (assuming petitioner did not deny or attempt to misrepresent any of his prior convictions).   Petitioner also has not shown a reasonable probability of a different trial outcome had he testified.  The First DCA's

rejection of this claim was not contrary to *Strickland* and did not involve an unreasonable application of *Strickland*.  Petitioner is not entitled to federal habeas relief on Ground Seven.

Ground Eight    "Defense counsel rendered ineffective assistance by guaranteeing defendant an acquittal, as well as misleading defendant to the maximum penalty, causing defendant to waive the State's plea and proceed to trial."  (Doc. 1, p. 25).

Petitioner alleges that prior to trial the State offered him "a three-year minimum mandatory prison sentence to resolve all charges in this case."  (Doc. 1, p. 25).  Petitioner alleges:

> In discussing the matter with defense counsel, defendant was led to believe that the State's case was weak that finding defendant guilty as charged would not be possible.  Worst case scenario, is found guilty of any charges, defendant would not get sentenced to anymore [sic] than three-to-six years, and would be back in court within 18-months when the First District Court of Appeal reversed and remanded his case.

(Doc. 1, p. 25).  Petitioner claims that "[h]ad it not been for counsel's deficient performance, there exists a reasonable probability that the outcome of the proceeding would have resulted in Defendant accepting the State's plea, which was for a significant[ly] less amount of time than the sentence he ultimately received after proceeding to trial and being found guilty by a jury."  (Doc. 1, p. 25).  Respondent concedes that petitioner exhausted this claim by raising it in his Rule 3.850

proceeding.  (Doc. 19, p. 57).  Respondent argues that petitioner is not entitled to relief because he fails to meet § 2254(d)'s standard.  (Doc. 19, pp. 57-61).

A.    Clearly Established Federal Law

"If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it."  *Lafler v. Cooper*, 566 U.S. 156, 168, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012).  The two-part test articulated in *Strickland* applies to claims that counsel was ineffective during plea negotiations.  *Lafler*, 566 U.S. at 163 (applying *Strickland's* two-part test to federal habeas petitioner's claim that counsel was ineffective for advising him to reject a plea offer); *Missouri v. Frye*, 566 U.S. 133, 140, 147-151, 132 S. Ct. 1399, 182 L. Ed. 2d 379 (2012) (applying *Strickland's* two-part test to federal habeas petitioner's claim that counsel was ineffective for failing to communicate a prosecution plea offer before it lapsed); *Hill v. Lockhart*, 474 U.S. 52, 48, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985) (applying *Strickland's* two-part test to defendant's challenge to his guilty plea based on ineffective assistance of counsel).

*Strickland's* first prong requires a defendant to show "'that counsel's representation fell below an objective standard of reasonableness.'"  *Hill*, 474 U.S., at 57 (*quoting Strickland*, 466 U.S. at 688)).  *Strickland's* second prong requires a

defendant to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.   In the context of pleas, "[t]he . . . 'prejudice' requirement . . . focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process."   *Hill*, 474 U.S. at 59. "[D]efendants who have shown a reasonable probability they would have accepted the earlier plea offer must also show that, if the prosecution had the discretion to cancel it or if the trial court had the discretion to refuse to accept it, there is a reasonable probability neither the prosecution nor the trial court would have prevented the offer from being accepted or implemented.  This further showing is of particular importance because a defendant has no right to be offered a plea, nor a federal right that the judge accept it."  *Frye*, 566 U.S. at 149 (citations omitted).

B.    Review of State Court Decision

Petitioner raised this claim as Ground 15 of his amended Rule 3.850 motion. The state circuit court identified the governing legal standard as the *Strickland* standard (Ex. N, pp. 284-285), and denied relief as follows:

**GROUND 15**

Defendant claims counsel was ineffective by guaranteeing him an acquittal and misleading him as to the maximum penalty, causing

Defendant to waive the Sate's plea offer.  Defendant alleges that prior to trial, the State offered a three year minimum mandatory prison sentence.  Defendant further alleges counsel led him to believe the State's case was so weak, finding him guilty as charged would not be possible, but if [it] were, Defendant would not get sentenced to any more than three to six years.  Defendant states but for counsel's advice, there was a reasonable probability he would have accepted the offer.

Defendant fails to allege the State would not have withdrawn the plea and the trial court would have accepted it.  *See Alcorn v. State*, 121 So. 3d 419, 430 (Fla. 2013).  Therefore, this claim is insufficiently pled.

Moreover, on September 23, 2011, Defendant appeared before the trial court and exercised his right to represent himself.  (Exhibit H, pp. 2, 10-11.)  He told the trial court he had to go to trial because he "didn't do this."  (Exhibit H, pp. 13-14.)  On November 10, 2011, Defendant told the trial court he could not plea out to something he had not done.  (Exhibit I, p. 9.)  At the November hearing, the trial court discussed the State's three year plea offer, noting Defendant did not seem to want to accept anything, and informed Defendant he was facing life. (Exhibit I, p. 19.)  A three year offer without a firearm count was then offered to Defendant, which the trial court would consider through the following Tuesday, November 15, 2011.  (Exhibit I, pp. 29-21, 24.)  Defendant told the trial court he would plea to supervision but would not plea to prison time, stating there was no way in the world he was going to prison for something he did not do.  (Exhibit I, pp. 22-23.)  Defendant acknowledged he was facing a life sentence.  (Ex. I, p. 25.)  Defendant stated he needed to prove his innocence by getting on the stand.  (Exhibit I, p. 29.)

At the time of these pre-trial proceedings, Defendant was representing himself.  Assistant Public Defender Ibanez was acting as standby counsel, although defendant refused to communicate further with her and attempted to have her discharged.  (Exhibit I, pp. 26-30.)  Assistant Public Defendant Crawford was appointed on November 28, 2011, when Defendant chose the week before trial to have the public

defender represent him.  (Exhibit B, p. 6.)  At the time of trial, just prior
to jury selection, there was no longer any plea offer from the State.
(Exhibit B, p. 11.)  The possibility of a plea was discussed by the trial
court, but Defendant stated he was ready to go to trial.  (Exhibit B, p.
22.)   The record therefore refutes Defendant's allegation that the
decision to reject the three year offer was based on advice of counsel.
The record also shows he was aware of the maximum penalty, and there
was no reasonable probability Defendant would have accepted the plea.
*Id*.

(Ex. N, pp. 294-296).  The First DCA summarily affirmed.  (Ex. O).

The state circuit court's findings of fact are amply supported by the record
and are borne out by the transcripts.  The First DCA reasonably could have accepted
the circuit court's findings and, based on those findings, reasonably could have
concluded that petitioner was aware of the maximum penalty he faced, and that his
rejection of the plea offer was not based on advice (much less misadvice) of counsel,
but rather on petitioner's personal belief in his innocence and his refusal to serve
prison time.  As the state circuit court's findings and reasoning provide a reasonable
basis on which the First DCA could have rejected petitioner's claim, petitioner is not
entitled to federal habeas relief on Ground Eight.

Ground Nine       <u>"Defense counsel rendered ineffective assistance by misadvising defendant on the State's strength in its case, causing defendant to waive a lesser offer from the Court of a two-year sentence."</u> (Doc. 1, p. 27).

Petitioner's final ground for relief alleges that counsel misadvised him as to the strength of the State's case, causing him to waive a two-year plea offer from the trial judge. Respondent concedes that petitioner exhausted this claim by raising it in his Rule 3.850 proceeding. (Doc. 19, p. 61). Respondent argues that petitioner is not entitled to relief because he fails to meet § 2254(d)'s standard. (Doc. 19, pp. 62-63).

    A.    Clearly Established Federal Law

The clearly established federal law governing this claim is set forth in Ground Eight above.

    B.    Review of State Court Decision

Petitioner raised this claim as Ground 16 of his amended Rule 3.850 motion. The state circuit court identified the governing legal standard as the *Strickland* standard (Ex. N, pp. 284-285), and denied relief as follows:

**GROUND 16**

> Defendant claims counsel was ineffective by misadvising him as to the strength of the State's case, causing him to waive a lesser two year sentence from the trial court. Just prior to jury selection on

December 5, 2011, the possibility of a plea offer was discussed by the trial court, which stated such an offer would require the State to "do some massaging." (Exhibit B, p. 22.) The trial court told Defendant he needed to talk to his counsel, and Defendant responded he was ready to go to trial. (Exhibit B, p. 22.) In his motion, Defendant alleges he discussed the matter with counsel. However, this allegation is refuted by the record, which indicates there was no off the record discussion held prior to his response. (Exhibit B, p. 22.)

Moreover, according to defendant's scoresheet, his lowest permissible sentence was 50.78 months. The State was also seeking sentencing as an HFO and PRR. There is no showing from Defendant's allegations or the record the State would have at that point cooperated with a negotiated two-year sentence.

(Ex. N, p. 296). The First DCA summarily affirmed. (Ex. O).

The state circuit court's findings of fact are amply supported by the record.

Just prior to jury selection, the trial judge asked the parties if they were interested in making one last attempt to resolve the case on a plea and indicated the terms the court would be willing to approve:

THE COURT: Mr. Montgomery, the State – I don't even know if they would support – I just said I would split the difference if you pled straight up.

THE DEFENDANT: What am I pleading to?

THE COURT: I don't know, but the State would have to do some massaging. That is where I am. The State is not willing to offer 11/15 or 11/30. I said to make it go away I would (sic) between three and 11/30 to two if the State massaged it so it worked and doesn't have an objection to it. If you don't want to take that I understand it. You have

the right to go to trial.  But that is the end of the discussions about it.
So you need to talk to your attorney.

THE DEFENDANT:  I'm ready to go to trial.

(Ex. C, pp. 21-22).  Petitioner did not consult with his attorney before rejecting the court's suggestion.  In addition, petitioner makes no showing that the State would have allowed a plea on the terms the court proposed.  Based on the lower state court's findings and the record, the First DCA reasonably could have concluded that petitioner failed to establish the required elements of *Strickland*, as further developed in *Lafler* and *Frye*.  Petitioner is not entitled to federal habeas relief on Ground Nine.

## CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides: "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  If a certificate is issued, "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  28 U.S.C. § 2254 Rule 11(a).  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  28 U.S.C. § 2254 Rule 11(b).

"[Section] 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'"  *Miller-El*, 537

U.S. at 336 (*quoting* 28 U.S.C. § 2253(c)).  A petitioner must "sho[w] that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000); *see also Buck v. Davis*, No. 15-8049, 580 U.S. —, 2017 WL 685534, at *12 (Feb. 22, 2017) (defining the relevant question as whether the district court's decision was "debatable" (*citing Miller-El*, 537 U.S. at 327)).  The petitioner here cannot make that showing.  Accordingly, the court should deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Rule 11(a), Rules Governing Section 2254 Cases.  If there is an objection to this recommendation by either party, that party may bring such argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully RECOMMENDED:

1.   That the petition for writ of habeas corpus (doc. 1), challenging the judgment of conviction and sentence in *State of Florida v. Maurice Kenneth Montgomery*, Escambia County Circuit Court Case No. 11-CF-4156, be DENIED.

2.   That the clerk be directed to close the file.

3.   That a certificate of appealability be DENIED.

At Pensacola, Florida this 24th day of March, 2017.


/s/ *Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**


<u>NOTICE TO THE PARTIES</u>

Objections to these proposed findings and recommendations may be filed within 14 days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon the magistrate judge and all other parties.  A party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.